## Case No. 6,137.

### HARRISON v. HADLEY et al.

[2 Dill. 229; 5 Chi. Leg. News, 206; 17 Int. Rev. Rec. 26, 44; 7 Am. Law Rev. 560.] [1]

Circuit Court, E. D. Arkansas. Jan. 13, 1873.

ENFORCEMENT ACT — XIII., XIV., AND XV. AMENDMENTS—ELECTION CONTEST—JURISDICTION OF UNITED STATES COURTS.

1. The federal courts have no jurisdiction in any form of action or proceeding over cases of contested elections for state officers, except in the single case provided for in the twenty-third section of the enforcement act (16 Stat. 140), in which the sole question touching the title to the office arises out of the denial of the right to vote to citizens on account of race, color, or previous condition of servitude.

[Cited in Manley v. Olney, 32 Fed. 709; Pierson v. Philips, 36 Fed. 838.]

2. The circuit courts of the United States can exercise jurisdiction in no case solely upon the ground that it falls within the constitutional grant of judicial power to the United States; there must also be an act of congress expressly conferring the jurisdiction.

3. A citizen does not lose his rights because congress has not vested in the courts of the United States original jurisdiction in cases where rights and benefits are claimed under the constitution of the United States. The state courts are open to such citizen, and in such cases the rule of decision in a state court is the same as it would be in a United States court.

4. The court comments upon the XIII., XIV., and XV. amendments, the civil rights act, and the enforcement act, and is of the opinion, under the evidence in the case, that they do not apply to the alleged exclusion of the voters at the election in controversy, as they were not excluded on the ground of race, color, or previous condition of servitude.

5. Injunction denied, bill dismissed, and case distinguished from Kellogg v. Warmouth [Case No. 7,667], in the district of Louisiana.

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission. 7 Am. Law Rev. 560, contains only a partial report.]

[This was a bill in equity by William M. Harrison against Ozro. A. Hadley, acting governor of the state of Arkansas, James M Johnson, secretary of state, Marshall L. Stephenson, Elhanon J. Searle, and John T. Bearden.]

The complainant alleges in his bill that at the general election held in this state, on the 5th day of November, 1872, there were, by law, to be voted for and elected two associate justices of the supreme court of the state, and that, at said election, the complainant and John T. Bearden were in fact and in truth duly elected to said offices, but that the respondents, acting in conjunction with the registrars, judges of election, and county clerks, in several counties in the state, have, by various illegal and fraudulent acts and practices, which are set out in the bill at great length, and with much minuteness, defrauded the complainant and said Bearden of the said offices to which they were so duly elected; that the secretary of state made an illegal and fraudulent canvass of the votes cast for said offices, by which it is made to appear that Elhanon J. Searle and Marshall L. Stephenson were elected to said offices, and that the governor of the state has illegally and fraudulently issued commissions to said Searle and Stephenson for said offices. The bill further alleges that if respondents Hadley and Johnson are not at once restrained from changing, altering or destroying the documentary evidence in relation to said election, the same will be obliterated, defaced or destroyed, and the complainant thereby greatly delayed, if not entirely prevented from obtaining justice. The bill alleges that some voters, wrongfully and fraudulently deprived of the right to register and vote, were white citizens, and some of them colored citizens, but there is no averment in the bill that the persons so wrongfully deprived, as alleged, of the right to register and vote, were so deprived on account of their "race, color, or previous condition of servitude," nor is it averred that such a number of voters were deprived of the right to vote on account of "race, color or previous condition of servitude" as to change or alter the result of the election. The bill prays, among other things, that the respondents, Searle and Stephenson, may be enjoined from exercising the functions and duties of the offices of associate justices of the supreme court; that the respondents, Hadley and Johnson, may be required to file in this court all the records and papers in their custody or control, pertaining to said election, and that they be enjoined from in any manner altering or destroying the same; that the respondent. Johnson, may be compelled by the order and mandamus of the court to send for and procure returns of said election from certain counties, from which it is alleged no returns have been made; that a general supervisor of election may be appointed, and that the supervisors of election, appointed under the act of June 10, 1872 (17 Stat. 348), may be required to make to such general supervisor "returns of said general election," and concludes with a prayer for general relief. All the respondents have answered under oath. The respondents Searle and Stephenson deny all the material allegations of the bill, and charge that by the illegal and fraudulent acts and practices of the friends and partisans of the complainant they were deprived of many votes, and their majority cut down, and, that but for such acts which are set out at length, and with much particularity, their majority would have been much greater than it is declared to be by the secretary of state. The respondents, Hadley and Johnson, specifically and fully deny all the illegal and fraudulent acts charged against them in the bill, and incorporated in their answer in a demurrer to the bill, in which they assign as cause of demurrer, that the court has no jurisdiction of the case made by the bill, and that upon the face of the bill the complainant is not entitled to the relief he prays for. The judge ordered an argument on the demurrer to the bill.

A. H. Garland, U. M. Rose, M. L. Rice, M. W. Benjamin, and Gallagher & Newton, for complainant.

T. W. Yonley, E. H. English, F. W. Compton, and Wilshire & Allen, for respondents.

CALDWELL, District Judge. Has the circuit court of the United States jurisdiction of the case made by the bill? This question does not relate to the form of the action merely, but the demurrer challenges the jurisdiction of the court to make any adjudication in any form of action upon the facts stated in the bill. It is not to be disguised that this is in effect a proceeding to contest in a United States court the title to a state office. And if this court has jurisdiction of this case, on the facts stated in the bill, then it has jurisdiction in all cases of contested elections, and that jurisdiction can be invoked to try every case involving a dispute as to which of two persons has been elected to any office, from the lowest township officer to the chief magistrate of the state. If such unqualified jurisdiction in this class of cases has been conferred, the court will not hesitate to assume and exercise it, however laborious and delicate it may be; but if it has not been expressly conferred by act of congress, it can not be assumed. On a question of jurisdiction the court has no discretion; if the suitor brings his case within the jurisdiction of the court he must be heard, and if his case is not within the jurisdiction of the court, he can not be heard, no matter what the merits of his case may be.

The question in the case before the court is not whether, under the recent amendment to the constitution, congress might not confer, without any qualification or limitation, jurisdiction on the circuit courts of the United

States, to determine a controversy between two citizens of the same state, involving the title to a state office, but the question is, have they done so? Although congress may possess the power under one, or all of the recent amendments to the constitution of the United States, to confer this jurisdiction on the courts of the United States, yet if they have not done so this court can not exercise it. It is an error to suppose that the courts of the United States have original jurisdiction to enforce or protect every right or privilege secured or guarantied to the citizen by the constitution of the United States, and acts of congress passed under its authority. For although the constitution of the United States declares that "the judicial power shall extend to all cases in law and equity arising under this constitution and the laws of the United States," it was early decided that this provision of the constitution did not itself vest in the circuit or district courts of the United States any jurisdiction whatever, but that those courts could exercise jurisdiction only in cases in which it had been expressly conferred by congress. Confessedly, the grant of the judicial power to the United States authorizes congress to confer on the courts of the United States a much broader original jurisdiction than they have done. But the principle is now established that the circuit court of the United States can exercise jurisdiction in no case solely upon the ground that it falls within the constitutional grant of judicial power to the United States. There must also be an act of congress expressly conferring the jurisdiction. The circuit court is a court of limited jurisdiction, and the supreme court has said that "the fair presumption is (not as with regard to a court of general jurisdiction that a cause is within its jurisdiction, unless the contrary appears, but rather) that a cause is without its jurisdiction till the contrary appears." Turner v. Bank of North America, 4 Dall. [4 U. S.] 8; U. S. v. Hudson, 7 Cranch [11 U. S.] 32; McIntire v. Wood, Id. 506; Hubbard v. Northern R. Co. [Case No. 6,818]; Ex parte Cabrera [Id. 2,278]; Sheldon v. Still, 8 How. [49 U. S.] 441; Karrahou v. Adams [Case No. 7,-614]. It does not result that because congress has not vested in the courts of the United States original jurisdiction in cases where rights and benefits are claimed under the constitution of the United States, and acts of congress passed under its authority, that a citizen loses these rights and benefits. The state courts are open to him, and in such a case the rule of decision in the state courts is precisely the same that it would be in a court of the United States. In the case at bar, for instance, whatever rights or benefits the complainant may be entitled to under the constitution and laws of the United States, must be adjudged to him in the state courts. This rule is imperative, and is found in the words of the constitution which declares, "This constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." If it is suggested that the state courts might misinterpret the constitution and laws of the United States, and a suitor in those courts might thus be deprived of the rights and privileges claimed under the constitution and laws of the United States, there is a ready and satisfactory answer. Congress has wisely provided for such a contingency, by declaring that in all such cases the judgment of the state court "may be re-examined and reversed or affirmed in the supreme court of the United States." Section 25, Judiciary Act. And by far the larger number of cases involving rights claimed under the constitution and laws of the United States, are only drawn within the control of the federal courts upon appeal or writ of error, after final judgment in the state courts. Martin v. Hunter's Lessee, 1 Wheat. [14 U. S.] 304; Story, Const. § 1702; Serg. Const. Law, 276, 277; The Moses Taylor, 4 Wall. [71 U. S.] 411–430. And a right of action given by an act of congress "does not imply a right to sue in the courts of the United States unless it is expressed." Bank of U. S. v. Devaux, 5 Cranch [9 U. S.] 61–86. Keeping these rules in view, let us inquire whether this court has jurisdiction of the case made by this bill. The jurisdiction is sought to be maintained under the acts of congress, passed to enforce the provisions of the recent articles (XIII., XIV., XV.) of amendment to the constitution of the United States, and known as the "Civil Rights Bill," approved April 9, 1866 (14 Stat. 27), and the "Enforcement Act," approved May 31, 1870 (16 Stat. 140), and the amendments thereto, approved February 28, 1871 (16 Stat. 433).

It is plain the civil rights bill does not confer jurisdiction on this court upon the case made by the complainant's bill. It may be conceded that the terms of that act are broad enough to embrace all persons without regard to their descent or color, but it is not pretended that the complainant in this case does not enjoy the "full and equal benefit of all laws and proceedings for the security of person or property," enjoyed by any other citizen; nor is it claimed that he is "denied or cannot enforce in the courts or judicial tribunals of the state any of the rights secured to him" by that act. The fifteenth article of amendment to the constitution of the United States, declares "the right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any state, on account of race, color or previous condition of servitude. The congress shall have power to enforce this article by appropriate legislation." Congress has legislated under this article, and that legislation is found in the enforcement act. The first sec-

tion of that act provides: "That all citizens of the United States who are or shall be otherwise qualified by law to vote at any election by the people in any state, territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction upon race, color, or previous condition of servitude." Succeeding sections of the act make ample provision for securing and protecting citizens otherwise qualified to vote from the deprivation of that right on account of their "race, color, or previous condition of servitude." This is done by giving to the injured party a right of civil action for damages, and punishing the guilty party, criminally, and in all such cases jurisdiction is expressly conferred on the United States courts. The twenty-third section of the act is the only one conferring jurisdiction on this court in cases of contested elections, and that section is in these words: "That whenever any person shall be defeated or deprived of his election to any office, except elector of president or vice-president, representative or delegate in congress, or member of a state legislature, by reason of the denial to any citizen or citizens who shall offer to vote, of the right to vote on account of race, color, or previous condition of servitude, his right to hold and enjoy such office, and the emoluments thereof, shall not be impaired by such denial; and such person may bring any appropriate suit or proceeding to recover possession of such office, and in cases where it shall appear that the sole question touching the title to such office arises out of the denial of the right to vote, to citizens who so offer to vote, on account of race, color, or previous condition of servitude, such suit or proceeding may be instituted in the circuit or district court of the United States of the circuit or district in which such person resides. And said circuit or district court shall have, concurrent with the state courts, jurisdiction thereof so far as to determine the rights of the parties to such office by reason of the denial of the right guarantied by the fifteenth article of amendment to the constitution of the United States, and secured by this act." This section bears upon its face evidence that it was drawn with unusual care and precision. By its terms the jurisdiction of this court in cases touching the title to an office is expressly limited to "cases where it shall appear that the sole question touching the title to such office arises out of the denial of the right to vote to citizens who so offered to vote, on account of race, color or previous condition of servitude." The language of this section is definite and precise, and is decisive of this case. Counsel who drew the bill in the argument frankly admitted complainant was unable to bring his case within the requirements of this section. It is clear from the bill itself that the alleged frauds were perpetrated without reference to the "race, color or previous condition of servitude" of the voters or candidates, and, if perpetrated, were prompted by no other or different motive than that which ordinarily impels men to commit such crimes. There is no other section of this or any other act of congress from which the jurisdiction in such cases can be deduced. Congress has not attempted to confer the jurisdiction except upon the single ground specified in this section, and it is therefore needless to inquire whether, under the constitution, they might extend the jurisdiction to all, or any other cases of this nature. Of the constitutionality of the section in question, I entertain no doubt.

In the argument reference was made to the case of Kellogg v. Warmouth [Case No. 7,667], pending in the United States circuit court for the district of Louisiana. The bill in that case is drawn with special reference to this twenty-third section, and all the necessary averments made to bring the case literally within its terms. The bill in that case charges expressly that the qualified voters who offered to vote, and whose votes were rejected, "were refused the right to vote on account of their race, color and previous condition of servitude." And these averments are repeated in reference to every fraudulent and illegal act charged in the bill, and are assigned and relied on as the sole ground for all the relief sought and prayed for by the bill. And from the newspaper report of that case it appears that the leading counsel for the complainant (Mr. Beckwith) rested the jurisdiction on the twenty-third section of the act and these averments in the bill, and that the court grounded, as indeed it must have done, its judgment on the question of jurisdiction on this section and these allegations in the bill. Saying nothing of the form of the proceeding and the particular relief sought and granted in that case, it is clear that the facts stated in the bill, brought the case exactly and literally under the twenty-third section. This the counsel for complainant in the argument broadly conceded had not been done in this case, because the complainant could not conscientiously make the averments required by that section to confer jurisdiction. In support of the jurisdiction, one of the counsel for complainant, in the argument, read from speeches made by senators in congress, while the enforcement act was pending before that body. An examination of the official report of the proceedings of congress, discloses the fact that the particular section of the bill to which those speeches related, was afterwards stricken out, and is not now found in the act. Indeed, if anything was wanting to show that congress never designed to confer on the courts of the United States jurisdiction in this class of cases, beyond the single case covered by the twenty-third section, it would be found in the legislative history of this measure. See Cong. Globe (2d Sess., 41st Cong.) p. 3561, where the principle of giving jurisdiction to United States courts in this class of cases is first broached in section 5 of the bill

there set out. It was much discussed by senators, and finally, with the consent of the chairman of the committee having charge of the bill, it was stricken out. Id. pp. 3570, 3654. Subsequently it was renewed by Senator Carpenter, in an amendment proposed by him (Id. p. 3680), and his proposition, after a modification, making it in legal effect what the twenty-third section now is, was adopted by the senate (Id. p. 3680), and passed that body (Id. p. 3690). The house not concurring in the amendments made by the senate, the bill went to a committee of conference, where the principle of conferring on the courts of the United States jurisdiction in contested elections, in any case, was specially considered, and the twenty-third section, as it now stands, was the result of that consideration, as is shown by the report of the committee to each house. The chairman of the committee of conference on the part of the senate, in reporting the action of the committee to the senate, referred particularly to the twenty-third section, and said, "The committee of conference have redrawn the section (23) very carefully, narrowing it down to the particular issue where the right to vote is denied for that specific reason (race, color, or previous condition of servitude), not drawing anything else before the United States courts, and for the purpose of giving effect to this fifteenth amendment." Cong. Globe (2d Sess., 41st Cong.) p. 3753. The chairman of the committee of conference on the part of the house, in reporting the action of the committee to the house, after quoting the twenty-third section, as it now stands in the statute, said: "I should have preferred, because I do not deem it essential to the success of this measure, that the senate had not raised this question with the house of contesting any election in the (United States) courts; but having raised it, I am content to enact the provision, with the limitation now put on it (into a law), and leave it thus forevermore, assured as I am it can work no possible harm, because in any event and in every event it leaves in the courts of the United States no power save to determine the single question where the person offering his vote shall have it rejected simply on the ground that his right, guarantied under the fifteenth amendment to the constitution of the United States, is denied. * * * I do not believe, under any possible condition of things, it would be necessary, as the constitution now stands, to vest in any of the courts of the United States any jurisdiction over the question of contested elections, beyond the express jurisdiction with the express limitation contained in the twenty-third section of the report." Cong. Globe (2d Sess., 41st Cong.) p. 3872.

It will be seen from these reports that the twenty-third section in its present form was the work of a conference committee, that embraced among its members, lawyers and jurists of eminence and national reputation, who were not likely to err in interpreting the work of their own hands.

Both houses of congress approved and assented to the views of the committee by adopting their report. The text of the act will admit of no other or different interpretation than that given to it by this committee. It is not pretended that the opinions of individual legislators can be received to alter the text or control the interpretation of an act of congress; but where, as in this case, an act has been carefully considered and revised by a conference committee, their opinions carefully and deliberately expressed, when they accord with the plain text of the act, show very conclusively that congress was not mistaken as to the legal effect of the language of the act, and did not intend that it should receive an interpretation different from the one plainly expressed.

It is suggested that although the court may not have jurisdiction of the principal subject matter, it may yet have jurisdiction to grant the auxiliary and ancillary relief prayed for in the bill. In answer to this suggestion, it is enough to say that there is no act of congress conferring jurisdiction to grant such auxiliary and ancillary relief, and the reasoning that excludes the jurisdiction of the court over the principal subject matter of the suit applies with equal force to the ancillary and auxiliary relief sought. The complainant is clearly mistaken in supposing the supervisors of election appointed in this state, under the act of congress approved June 10, 1872 (17 Stat. 348, 349), have any authority to supervise or report upon the election of state officers. No return or report they might make in reference to the election of any state officer could have any official sanction, or be received as evidence in this or any other court. The court having no jurisdiction on the case made by the bill to determine in any form of action the right of complainant to the office in dispute, it is needless to inquire whether a bill in chancery will lie in such case, or whether the remedy must be by quo warranto. And for the same reason it is unnecessary to inquire whether the court, supposing it to have jurisdiction, could grant the several injunctions and restraining orders prayed for in the bill. The complainant must, therefore, be remitted to the justice of his own state tribunals, where from the foundation of the government down to the present time, the exclusive jurisdiction over cases of contested election for state offices has been vested and still remains, except where the case turns solely on the single fact specified in the twenty-third section. The demurrer to the bill is well taken, and the injunctions and other extraordinary writs and relief prayed for are refused, with leave to complainant to have a reargument upon the demurrer, before a full bench at the next term. Demurrer sustained.

NOTE.—No desire was expressed at the term to have the questions decided in the foregoing

opinion heard before the full bench. Enjoining the governor of a state in the federal courts, Murdock v. Woodson [Case No. 9,942]. Indictment of governor, U. S. v. Clayton [Case No. 14,814].

Enforcement Act — Mode of Administration. As part of the judicial history of the circuit, it may be of interest to the profession to be appraised of the manner in which the anomalous and delicate duties required of the judges of the federal courts by the act of Congress, entitled "An act to amend an act approved May 31, 1870, entitled 'An act to enforce the right of citizens of the United States to vote in the several states of this Union, and for other purposes,'" approved Feb. 28, 1871, and the first section of the act approved June 10, 1872, amendatory thereof, have been performed. This will appear by the following statement: In July, 1872, various applications from the state of Arkansas having been made to the circuit judge, in conformity with the act of congress providing for the appointment and defining the duties of "supervisors of elections," in which applications the petitioners stated their desire to have the registration and succeeding election guarded and scrutinized (the said election being one at which representatives in congress were to be voted for), the circuit judge, under the amendatory act, approved June 10, 1872. made and transmitted to the clerk of the circuit court for the Eastern district of Arkansas, the following designation and appointment: "United States of America, Eighth Judicial Circuit, ss. Being unable, by reason of distance, and from other causes to perform and discharge the duties within the state of Arkansas, imposed by 'An act to enforce the rights of the citizens of the United States to vote in the several states of this Union, and for other purposes,' and acts to amend the same, I do hereby select and appoint in my place and stead to act for and within the said state of Arkansas, the Hon. Henry C. Caldwell and the Hon. William Story, who are respectively the judges of the district courts of the United States for the Eastern and Western districts of Arkansas; and if one of the said judges shall be absent from the state, or unable to act, then the appointment shall be to the other solely, and severally, and I do hereby direct and assign to them, or to either of them, as aforesaid, within and for the state of Arkansas, the performance of all duties, and acts, and the exercise of all powers, functions, and jurisdiction, by the aforesaid acts of congress imposed and conferred upon me. Given under my hand at chambers, in the city of Davenport, this, the 6th day of August, A. D. 1872. John F. Dillon, Circuit Judge, Eighth Judicial Circuit." On the tenth day of August, 1872, court was opened at Little Rock, and the foregoing appointment entered of record, and the said judges notified thereof. An order was made of record that the court remain open from day to day for the performance of the duties imposed and the exercise of the powers conferred by the said acts of congress. On the thirteenth day of August, 1872, the following letter was addressed to the chairman of the Republican and Democratic State Central Committees, respectively, both of whom,—among many others, —had asked the benefit of the said acts of congress:—"Little Rock, Arkansas. Sir: I am directed by the judges to advise you that in pursuance of the act of congress and the order and appointment of the circuit judge, the circuit court of the United States is now open in this city, and will remain open for the purpose of appointing supervisors of election for the various election precincts of this state under the act of congress providing for the same. When this jurisdiction is invoked by proper petitions, the act provides for the appointment of two supervisors of election for each precinct, who can read and write the English language, and who are of different politics, and qualified voters of the precinct. I am also directed by the judges

to say, that owing to their limited personal knowledge of men and their politics, in the various parts of the state, they will be unable to select, upon their own knowledge, proper persons, having the required qualifications to act as such supervisors. In view of this fact, and inasmuch as the act of congress provides that the supervisors of each precinct shall be opposed in politics, the judges have determined to devolve on the Democratic and Republican State Central Committees, respectively, the responsibility of recommending one of the supervisors for each precinct. The persons so recommended by your committee will be appointed by the court, unless it be shown that they do not possess the qualifications required by the act, or are otherwise unfit for the position, and in such case your committee will be notified and requested to recommend some other suitable person. This practice will insure each party a representative of its choice upon the board. The court trusts that your committee will recommend men for the appointment of supervisors whose standing and character will be a guarantee that they will honestly discharge the duties imposed on them by the act of congress. Very respectfully, Ralph L. Goodrich, Deputy Clerk U. S. Circuit Court." Recommendations were made accordingly, and the persons recommended were appointed unless known or shown to be unfit for the duty, and persons in each election district or voting precinct thus appointed received a commission, under the seal of the circuit court, by which "they and each of them were authorized and empowered jointly and severally, to exercise and discharge all and singular the rights, powers, and duties conferred on 'supervisors of election' by the first section of the act of congress aforesaid, approved June 10, 1872." It may, perhaps, properly be added that no complaints reached the court or its judges, of the course adopted, but on the contrary, they had many evidences that their action was universally satisfactory to the citizens of the state.